# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **OAKWOOD UNIVERSITY, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 5:18-cv-870-MHH** |
| ) | |
| **OAKWOOD UNIVERSITY** ) | |
| **ALUMNI ASSOCIATION,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION</u>

Family disagreements are painful for everyone involved.  This case concerns a disagreement between Oakwood University and its offshoot and former ally, the Oakwood University Alumni Association.   Recently, the relationship between Oakwood University and the Oakwood University Alumni Association has become strained -- so strained, in fact, that Oakwood University has broken its ties with the Oakwood University Alumni Association.  The Court's efforts to help the parties mend their relationship have been unsuccessful, so the time has come for the Court to resolve some of the pending motions in this case.  This opinion addresses the

University's request for a preliminary order prohibiting the Alumni Association from using the trademark "Oakwood University" in the Association's name and from using other marks that may cause alumni and others to confuse the University and the Alumni Association, especially with respect to alumni giving.

Oakwood alumni always have had good reason to support Oakwood University. Oakwood University is one of Alabama's storied educational institutions. As the University explains on its website:

> Oakwood University, in Huntsville, Ala., was founded by the Seventh-day Adventist Church (SDA) in 1896 to educate the recently-freed African-Americans of the South. Drawing upon its Christian faith and the emancipation of slaves by President Abraham Lincoln in 1863, it believed that "all people are created equal" and deserved the opportunity to learn a trade.
>
> Originally, the school was called "Oakwood Industrial School," opening its doors November 16, with 16 students. A year earlier, the 380-acre former slave plantation was purchased for $6,700. Its towering oak trees – which gave way to the name "Oakwood" – dotted the early residence of America's most famous slave, Dred Scott. Additional land was acquired in 1918, nearly tripling the campus size to its current 1,186 acres.[1]

Since its founding, the University has expanded not only its campus but also its student body and curriculum, evolving from an industrial school to a university offering more than 58 majors and accredited "to award associate, baccalaureate, and

---

[1] OAKWOOD UNIVERSITY: MISSION & HISTORY, https://www2.oakwood.edu/our-story/mission-history/ (last visited July 30, 2020); *see also* Doc. 1, p. 5.

master's degrees."[2]  Oakwood University "offers quality Christian Education that emphasizes academic excellence, promotes harmonious development of mind, body, and spirit, and prepares leaders in service for God and humanity."[3]

Alumni of the University have much to celebrate:

Oakwood is consistently recognized by national media, business and educational associations. US News and World Report ranks it perennially among the nation's "Best Colleges," both in terms of the "Historically Black Colleges and Universities" (HBCUs) and "Regional Colleges/South" categories; the magazine also ranks Oakwood among the top ten HBCUs with highest graduation rates. In its first-ever HBCU ranking, the September 2012 EBONY Magazine top-ranked Oakwood's science program. Additionally, Oakwood is the nation's fifth-ranked producer of undergraduate black applicants to medical schools, according to the Association for American Medical Colleges. Oakwood's ISO 9001: 2008 designation distinguishes it as the first and only HBCU, as well as the first and only Alabama and/or SDA higher education institution, so qualified.[4]

Oakwood University embraces its alumni:

**Enter to Learn.  Depart to Serve.**

Every Oakwoodite knows this motto and lives it every day!  We are proud of you and it is our pleasure to serve YOU.

---

[2] OAKWOOD UNIVERSITY: OUR STORY, https://www2.oakwood.edu/our-story/ (last visited July 30, 2020).

[3] OAKWOOD UNIVERSITY: MISSION & HISTORY, https://www2.oakwood.edu/our-story/mission-history/ (last visited July 30, 2020);

[4] OAKWOOD UNIVERSITY: MISSION & HISTORY, https://www2.oakwood.edu/our-story/mission-history/ (last visited July 30, 2020); *see also* Doc. 1, p. 5.

> Alumni Relations is here to keep you connected to the school you love and to the people you cherish.  We know the connections made here are for a lifetime.[5]

Given Oakwood University's history, mission, and rich tradition of accomplishment, it comes as no surprise that Oakwood alumni are deeply invested in their school and are proud of the bonds they share as alumni.  And it comes as no surprise that both the University and the Alumni Association wish to foster those bonds and cement their relationships with alumni.  "What's in a name?"[6]  A lot, when it comes to alumni relations.  To resolve the pending motions concerning Oakwood University's effort to prevent the Alumni Association from using "Oakwood University" in its name, the Court first will make factual findings concerning the evidence presented by the parties.  Then the Court will examine whether the University has demonstrated, among other things, a substantial likelihood of ultimate success on the merits of its trademark infringement claim and a substantial threat of irreparable injury if the Alumni Association continues to use the name "Oakwood University."

---

[5] OAKWOOD UNIVERSITY: ALUMNI, https://www2.oakwood.edu/alumni/ (last visited July 30, 2020) (emphasis is from the University's website).

[6] William Shakespeare, *Romeo and Juliet* (Act II, Scene ii).

# I.      FINDINGS OF FACT

In accordance with Rule 52(a)(2) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact:[7]

## A. <u>The Creation and Evolution of the University and the Association</u>

Oakwood University, Inc. is an Alabama non-profit corporation with its principal place of business in Madison County, Alabama.  The University is a tax-exempt institution and accepts contributions from donors.  (Doc. 1, pp. 2, 8, ¶¶1, 17; Doc. 15, pp. 1, 4, ¶¶1, 17).[8]  Alumni represent a significant segment of the University's donor base.  (Doc. 1, p. 8, ¶17).

The University launched operations in 1896 as "Oakwood Industrial School." (Doc. 15, p. 20, ¶7; Doc. 20, p. 3, ¶7).[9]  In 1904, "Oakwood Industrial School"

---

[7] Rules 52(a)(1) and (2) provide:

> (1) *In General*.  In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

> (2) *For an Interlocutory Injunction*.  In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action.

Fed. R. Civ. P. 52 (a)(1)-(2).

[8] Doc. 1 is the University's verified complaint.  The Alumni Association admitted these factual allegations in its Answer and Counterclaim, Doc. 15.

[9] The citation references the Alumni Association's factual allegation in the Answer and Counterclaim (Doc. 15) which the University admitted in its Answer to the Counterclaim (Doc. 20).

changed its name to "Oakwood Manual Training School," and then, in 1917, changed its name again to "Oakwood Junior College." (Doc. 15, p. 20, ¶7; Doc. 20, p. 3, ¶7; Doc. 40-1, p. 1, ¶4).

In 1926, the graduating class of Oakwood Junior College formed an alumni association called the Oakwood Junior College National Alumni Association. (Doc. 15, p. 20, ¶8; Doc. 40-1, p. 1, ¶4). The alumni association's mission was to serve and support the college with fundraising, student recruitment, and other activities. (Doc. 40-1, p. 1, ¶8). Before the early 1960s, the college housed, sponsored, and subsidized the alumni association's operations. (Doc. 40-1, p. 1, ¶5). The new alumni association conducted its business on campus through employees and staff of the college. (Doc. 40-1, p. 1, ¶4). Until 1964, the president of the alumni association was a faculty or staff member of the school. (Doc. 40-1, p. 1, ¶5).[10] Since 1964, all but one of the twelve alumni association presidents have served from off campus. (Doc. 40-1, p. 1, ¶5). The trend of off-campus leadership began by agreement between the college and the alumni association. (Doc. 40-1, p. 1, ¶5).

In 1943, Oakwood Junior College changed its name to "Oakwood College." (Doc. 15, p. 20, ¶10; Doc. 20, p. 3, ¶10). That year, the alumni association also

---

[10] The first president of the alumni association was O.B. Edwards. President Edwards served in that role from 1926 through 1939. (Doc. 40-1, p. 1, ¶4). Over his career at the college, Mr. Edwards served as a professor and as vice president for academic affairs. (Doc. 40-1, p. 1, ¶4).

changed its name to the Oakwood College Alumni Association. (Doc. 15, p. 20, ¶11).[11] Like Oakwood Junior College, Oakwood College assisted in the formation and operation of the alumni association. (Doc. 40-1, p. 1, ¶5). Oakwood College recognized the alumni association would use the school's name, logos, symbols, and color schemes in connection with fundraising for the college. (Doc. 40-1, p. 2, ¶11). For instance, the alumni association used Oakwood College's seal on its stationary. (Doc. 40-1, p. 2, ¶11). The college gave the alumni association permission to use the school's name, logos, symbols, color schemes, and good-will in connection with an "unwritten understanding" the alumni association would raise funds for the college. (Doc. 40-2, p. 2, ¶8).[12]

---

[11] Doc. 15 is the Alumni Association's unsworn Answer and Counterclaim. The University lacked sufficient information to admit or deny the fact stated. (Doc. 20, p. 3, ¶11).

[12] This fact comes from the declaration of Jennifer Mosley Stone which Oakwood University has offered in support of its request for a preliminary injunction. (Doc. 40-2). The record also contains the declaration of Eardell J. Rashford, which the Alumni Association has offered in opposition to the University's motions. (Doc. 41-2). In his declaration, Mr. Rashford states that, "[t]o [his] knowledge," neither Oakwood College nor the University restricted or controlled the alumni association's use of the University's trademarked symbols or entered into an agreement with the alumni association for their use, and to his knowledge, "there has never been a formal written or unwritten agreement between the University and OUAA regarding the use by OUAA of "Oakwood College" or "OCAA." (Doc. 41-2, p. 3, ¶¶6–7). The Court credits Dr. Stone's description of the relationship between the college and the alumni association because her assertions are rooted in her personal knowledge and experience in 20 years of service to the Alumni Association in various leadership roles including President and Vice-President of the Alumni Association. (Doc. 40-2, p. 1, ¶¶2–3). Mr. Rashford seems to have played a more limited role, serving as the parliamentarian to the Oakwood College Alumni Association Board of Directors before the college developed into the university, and the OCAA became the OUAA. (Doc. 41-2, p. 1, ¶2). Mr. Rashford does not state directly that there was no agreement between the parties or that the college did not give the association permission to use the college's marks. He simply states that he does not have personal knowledge of that permission.

In 2007, the University changed its name from "Oakwood College" to "Oakwood University." (Doc. 1, p. 5, ¶9; Doc. 15, p. 2, ¶9).[13] In 2010, the alumni association became known by its present name, the Oakwood University Alumni Association. (Doc. 15, p. 21, ¶13; Doc. 40-2, p. 1, ¶2).[14] Oakwood University continued to give the alumni association permission to use the school's name, logos, symbols, color schemes, and good-will in connection with the "unwritten understanding" the alumni association would raise funds for the university, and the university would coordinate fundraising efforts. (Doc. 40-2, p. 2, ¶8, 12).[15]

The University's accreditation is contingent on its oversight of fundraising benefitting the University. The University is accredited by the Southern Association of Colleges and Schools Commission on Colleges (SACSCOC) and must comply with the core requirements and standards of SACSCOC. (Doc. 40-3, p. 1, ¶3). Dr. Belle S. Wheelan, the current president of the SACSCOC, has explained:

> 5. All SACSCOC accredited institutions must maintain compliance with the current edition of the Core Requirements and Standards

---

[13] Doc. 15 is the Alumni Association's unsworn Answer and Counterclaim. The University lacked sufficient information to admit or deny the fact stated. (Doc. 20, p. 4, ¶13).

[14] The Oakwood University Alumni Association is a separate legal entity from the University. (Doc. 41-1, p. 2, ¶5; Doc. 41-3, p. 2, ¶3; Doc. 41-4, p. 3, ¶7). Since at least March 1991, the IRS has recognized the Alumni Association as a tax-exempt entity pursuant to section 501(c)(3) of the Internal Revenue Code, distinct from the University. (Doc. 41-1, p. 2, ¶¶3, 4; Doc. 41-1, p. 9).

[15] In her declaration, Dr. Stone stated: "At all times (including when I was Vice President and President of OUAA), the OUAA had an unwritten understanding with the University. As part of this understanding, OUAA had the University's permission to use its name, logos, symbols, color schemes, and good will in connection with OUAA's fund-raising efforts for the University." (Doc. 40-2, p. 2, ¶12).

contained in the *Principles of Accreditation: Foundations/or Quality Enhancement* ("*Principles*"). Noncompliance with Core Requirements and Standards could jeopardize the institution's accreditation status.

6. The *Principles* Section 5: *Administration and Organization* (Section 5), addresses the role and responsibilities of institutional administrative officers. Specifically, Section 5.2.c governs the role of the chief executive officer regarding fundraising (*Principles*, Section 5.2. c) and Section 5.3.c, governs the exercise of control of 'institution-related entities' engaged in fundraising activities. *Principles*, Section 5.3.c.

7. Section 5.3.c of the *Principles* ("Section 5.3.c") requires a member institution to exercise sufficient control over the fundraising activities of "institution-related entities."   *Principles*, Section 5.3.c. An institution-related entity is one organized separate from the SACSCOC member institution; but, whose purpose is to raise funds to support that institution and its programs. The Standard requires that any such entity must be subject to the control of the institution when engaging in fund-raising activities to support the institution or its programs. An alumni association organized separately from a member institution is a common example of an institution-related entity.

8. A member institution can exercise the required level of control over institution-related entities in one of two ways. First, the institution demonstrates, through the CEO or his/her designee, control of any fund-raising activities of the institution-related entity. Second, the institution may enter into a formal, written agreement that governs the fund-raising activities on behalf of the institution, assuring that the fund-raising activities further the mission of the institution.

9. Even if an institution and institution-related entity have entered into a formal, written agreement as evidence of compliance with Standard 5.3.c, compliance requires that the institution demonstrates control of the institution-related entity's fund-raising activities undertaken to support the institution or its programs.

10. **If an institution-related entity raises funds for the institution without operating under that institution's control, as set out in Section 5.3, it would appear noncompliant with the Principles of Accreditation and jeopardize the institution's accreditation status**.

11. Section 1 of the *Principles* ("Section 1") mandates that integrity, openness and candidness permeate all the institutions' obligations under SACSCOC accreditation standards. *Principles of Accreditation: Foundation for Quality Enhancement*, Section 1: The Principle of Integrity. The standard is operationalized in a policy statement. A true and correct copy of SACSCOC's Policy Statement entitled "Integrity and Institutional Obligations to SACSCOC" is attached hereto as Exhibit "A".

12. As part of the policy of integrity, a member institution must disclose possible accreditation violations as part of its candidacy or membership with SACSCOC. When a member institution becomes aware of anything that potentially impacts its compliance with the Principles, the member institution must notify SACSCOC (sometimes referred to as "self-reporting"). Failure to comply with the SACSCOC's integrity principle may result in a loss of accreditation for a member institution.

(Doc. 40-3, pp. 1–2, ¶¶5–12; *see* also, Doc. 41-1, pp. 4, 5, ¶¶10, 11) (emphasis added).

A memorandum of understanding, or "MOU", is an example of the type of formal, written agreement that could define the fundraising activities of an external entity like the Alumni Association. (Doc. 41-1, p. 4, ¶10; Doc. 41-1, pp. 85, 87). The University and the Alumni Association have not had an MOU or any other formal, written agreement concerning the Alumni Association's fundraising for the University. (Doc. 41-1, pp. 3, 5, ¶¶7, 12). Therefore, under SACSCOC standards, the University's CEO or her designee must control of fundraising activities of the Alumni Association.

According to its bylaws, the Alumni Association has one purpose: "to support the education institution, Oakwood University, located in Huntsville, Alabama." (Doc. 1-3, p. 2).  The bylaws state "[t]he membership will support the University through benevolent giving, scholarships, and recruitment providing financial support to students and the University through the campaigns of the Association." (Doc. 1-3, p. 3).  The bylaws also provide that the Alumni Association's president "shall communicate continuously with the University officials and the Association Officers and Elected Officials in order to achieve maximum planning and coordination between the Association and the University."  (Doc. 1-3, p. 7).  From its inception, for many years, the Alumni Association cooperated with and coordinated fundraising efforts with the University.  (Doc. 1, p. 9, ¶19; Doc. 15, p. 4, ¶19).  The Alumni Association collected funds and then, as an organizational donor, contributed those funds to the University.   (Doc. 41-4, p. 3, ¶7).   The University's president has ex-officio membership on the Alumni Association's board of directors.  (Doc. 1-3, p. 6).

Dr. Mervin Warren, who served as the president of the Oakwood College Alumni Association from 1962 to 1963 and has written books about the history of Oakwood University, recalls conducting the alumni association's business from the college's campus using the college's resources.  (Doc. 40-1, p. 1, ¶¶ 3, 6 & p. 2, ¶9). Dr. Warren understood "that the association's fund-raising [sic] was answerable to

the College." (Doc. 40-1, p. 2, ¶10; *see also* Doc. 40-1, p. 2, ¶12 ("[T]here have always been discussions between Oakwood University and its alumni association regarding the purposes and targets of alumni fund-raising [sic].")). Dr. Warren notes "the [A]ssociation's use of the school's name was indicative of both the Oakwood University and the . . . Association were operating for the common good." (Doc. 40-1, p. 2, ¶13).

Dr. Jennifer Moseley Stone, who served as the Alumni Association's president from 2012 through 2015, confirms that the Association's mission "was to support and raise funds for the University." (Doc. 40-2, p. 1, ¶¶ 2, 4). While Dr. Stone was the Association's president, she understood the University had to be involved in the Association's fundraising per SACSCOC accreditation. (Doc. 40-2, p. 2, ¶9). If there was a difference of opinion between the two organizations, they would work together to "find common ground or otherwise resolve the difference." (Doc. 40-2, p. 2, ¶11). There never was a time during her tenure that the Alumni Association ignored or defied the University's directives regarding fundraising. (Doc. 40-2, p. 2, ¶11).

Dr. Leslie Pollard, the current President and CEO of the University, has explained that "between 2011 and early 2018, whenever I objected to OUAA fundraising or materials as conflicting with University standards, OUAA would comply." (Doc. 44-1, p. 2, ¶1 & p. 3, ¶9). In her declaration, she states:

Based on my experiences, the relationship between OUAA (and previous associations) and the University (and its predecessors) included the practice that OUAA would submit a proposed fundraiser/solicitation to the University for approval before proceeding with it. This certainly was the case approximately four years into my Administration when Dr. Cynthia Powell-Hicks became President of OUAA in 2015. However, shortly after she took office, I learned that Dr. Powell-Hicks and OUAA had started a new fundraiser effort called "President's Fundraiser", without seeking permission/approval, and were asking that it be advertised on the University's website and newsletter. As soon as I found out about this, I objected to it on various grounds, including that donors could mistake who was behind the fundraiser and where funds would go.

(Doc. 44-1, pp. 3–4, ¶10).   The Alumni Association then cancelled the proposed

fundraiser and subsequently submitted fundraising proposals for pre-approval by the

University.  (Doc. 44-1, p. 4, ¶16).  Dr. Pollard states:

When OUAA's planned fundraising effort/communication met the University's standards and expectations, we would approve them. When a fundraising effort or communication did not meet our expectations or standards, we would inform OUAA, and it would comply. For example, in March 2016, I became aware of a fundraising solicitation suggesting that OUAA and the alumni association of Oakwood Adventist Academy (a Kindergarten through 12th grade school located on Oakwood's campus) were holding a "joint fundraiser" for the Academy. After I learned of this unapproved effort, I let Dr. Powell-Hicks know of my objection, and OUAA did not proceed with the fundraiser.

[] Another example of the University rejecting a proposed fundraiser and use of the University's name and good will occurred in 2017. In January of that year, OUAA informed the University of an idea called "Oakfest", which it thought would "revamp" Alumni Weekend. It wanted to use an outside group called "Superlative Events" as its agent to run Oakfest. Ultimately, the University rejected the Oakfest concept and any association with Superlative Events, which advertised events that appeared to undermine the teachings and message of OU and the

Seventh-day Adventist Church. OUAA acceded to the University's decision.

(Doc. 44-1, pp. 4-5, ¶¶16-17).

In making these fund-raising decisions, the University has not singled out the Alumni Association for special treatment.  Because of its obligation to comply with SACSCOC accreditation standards, the University has intervened in fundraising efforts by other organizations.  In 2012, an on-campus ministry group was using the University's name in association with the group's fundraising.  The group did not give the university an opportunity to review and provide input with respect to fundraising.  (Doc. 44-1, p. 4, ¶13).  Ultimately, "the Board voted to remove that ministry from [] campus because their fundraising did not conform to the University's accreditation requirements, and was confusing donors and the public." (Doc. 44-1, p. 4, ¶13).

## B. <u>The Registration of the "Oakwood University" Mark</u>

On August 6, 2008, the University filed U.S. Trademark Application Serial No. 77/540,675 for the "OAKWOOD UNIVERSITY" mark with the United States Patent & Trademark Office.  (Doc. 1, p. 5, ¶10).  Eight months later, the United States Patent and Trademark Office issued trademark registration number 3,601,698 for "metal key chains; metal novelty license plates" in International Class 6; "desk blotters, loose leaf binders, notebooks, paper report covers, note paper, pens, pencils, bookmarks, stickers, decals, postcards, notepad holders, pocket calendars,

weekly calendars; stationery, namely, writing paper and envelopes, desk and  memo pads; ink pens combined with holders, adhesive tape dispensers and paperweights; magazines featuring general interest topics pertaining to  a university, its students and the community" in International Class 16; "backpacks, book bags, sports bags, bum bags, wallets and handbags" in International Class 18; "Plastic drinking mugs, plastic cups, metal drinking mugs, drinking  glasses, ceramic mugs, ceramic drinking cups, ceramic vases, ceramic pitchers" in International Class 21; "Cloth banners and flags" in International Class 24; "T-shirts, gym shorts, sweatshirts, sweatpants, athletic jackets, wind resistant jackets, golf shirts, un-collared  shirts, infant wear, neckties, athletic uniforms, sweatbands, baseball caps, bow ties, sleepwear, rain wear" in International Class 25; and "educational services, namely, providing courses of instruction on the college and university levels; entertainment services, namely, live music concerts; entertainment in the nature of presenting live musical groups, plays, and music and poetry recitals, and art exhibitions" in International Class 41. (Doc. 1, pp. 5–6, ¶10; Doc. 1-1, pp. 2–3; Doc. 15, pp. 2–3, 21–22, ¶¶10, 16; Doc. 20, p. 4, ¶16).  In its application, the University did not claim the exclusive right to use the term "University" other than as part of the phrase "Oakwood University."  (Doc. 1-1, p. 2).  On January 1, 2008, eight months before filing its trademark application, the University began displaying

this mark in connection with University goods and services on its campus, through its website, and in retail stores.  (Doc. 1, p. 6, ¶11).

### C. **The "Ancillary Marks"**

The University owns the following "Ancillary Marks":  trademark registration number 3,591,212 for the following stylized mark:



(Doc. 1-2, pp. 2–3); trademark registration number 4,352,439 for the following stylized mark:



(Doc. 1-2, pp. 4–5); trademark registration number 4,954,242 for the following stylized mark:



(Doc. 1-2, pp. 6–7; Doc. 1, p. 7, ¶15); pending trademark application 87/828,018 for

the following stylized mark:



(Doc. 1-2, pp. 8–14); pending trademark application 87/737,208 for the following

stylized design:



(Doc. 1-2, pp. 15–16); and pending trademark application 87/737,193 for the following standard charter mark: "THE AEOLIANS." (Doc. 1-2, pp. 17–18; *see also* Doc. 1, pp. 7–8, ¶15).

Since January 1, 2008, the University has used the "Oakwood University" mark and the ancillary marks separately and collectively to identify the University's services and to distinguish those services from the services of other educational institutions. (Doc. 1, p. 8, ¶16). The University prominently displays and uses these marks on school buildings, letterhead, correspondence, bills, direct mailings, and school and alumni newsletters, among other things. (Doc. 1, p. 8, ¶16). The University also regularly uses the Oakwood University mark and ancillary marks in its fundraising efforts. (Doc. 1, p. 8, ¶17). And the University has monitored others' use of its marks. Dr. Pollard explained:

> As part of my role as CEO of the University, I have monitored OUAA's fundraising proposals and use of the University's name, trademarks, good will, logos, color schemes, etc. to make sure they did not conflict with the University's mission, standards or programs or in a way that could cause confusion.

(Doc. 44-1, p. 3, ¶9).

### D. __The University Severs Ties with the Association__

In 2018, donors to the Alumni Association began to express frustration with the Association to the University. (Doc. 1, p. 13, ¶¶30–31).[16] On February 23, 2018, the Alumni Association lost its tax-exempt status because the Association did not file IRS Form 990 returns for the preceding three years. (Doc. 1, p. 14, ¶32).[17] The following, taken from the verified complaint, is not disputed in the record:

> 33. Given the gravity of these concerns and the negative public relations impact these issues could have on fund-raising efforts and SACS compliance, the University's Board of Directors (the "Board") convened on March 8, 2018. At this meeting, the Board empaneled a "taskforce," led by a former President of the University, to look into the issues and make recommendations intended to protect donors, comply with SACS 5.3, and to allow the Former Association to navigate through the upcoming Alumni Weekend with minimal public confusion and embarrassment.[18]

---

[16] In its Answer, the Alumni Association stated it lacked knowledge or information sufficient to form a belief as to the truth of these allegations, and therefore denied them. (Doc. 15, p. 6, ¶¶ 30–31).

[17] The Alumni Association attributes the loss of its tax-exempt status to a clerical error by the University. (Doc. 15, p. 6, ¶32).

[18] In its verified complaint, the University refers to the Oakwood University Alumni Association as "the Former Association."

34. On March 13, 2018, the Board (through the task force's report) requested certain financial information and assurances from the Former Association, particularly relating to its intended fundraising and the Alumni Weekend scheduled for later that month . . .

35. The Former Association communicated to the Board that it planned to submit a response to the Task Force Report by March 20, 2018. With this understanding, the Board scheduled a meeting for March 21, 2018 during which it intended to review the response. However, the Former Association informed the Board that it would not be responding by March 20, 2018, but that the Board would be hearing from the Former Association's lawyer.

(Doc. 1, p. 14).

On March 19, 2018, the Alumni Association, through Dr. Powell-Hicks, reserved the name "Oakwood University Alumni Association" with the Alabama Secretary of State's Office. (Doc. 1, p. 26, ¶64; Doc. 15, p. 12, ¶64).[19]

It is not disputed that the following, taken from the verified complaint, then occurred:

36. On March 20, 2018, counsel for the University attempted to reach an understanding with the Former Association's lawyer . . ..

37. The Board held its March 21, 2018 meeting to discuss the issues with the Former Association . . . The Board was willing to put off action concerning the Former Association until after the approaching Alumni Weekend, but it was not comfortable with the association soliciting or raising funds from Alumni while its tax-exempt status was revoked. The Former Association's President attended this Board meeting and, among other things, stated that she would not communicate with the

---

[19] *See* ALABAMA SECRETARY OF STATE BUSINESS ENTITY RECORDS: OAKWOOD UNIVERSITY ALUMNI ASSOCIATION, (http://arc-sos.state.al.us/cgi/corpdetail.mbr/detail?corp=791278&page=name&file=Q&type=ALL&status=ALL&place=ALL&city= (last visited July 30, 2020).

University, instead instructing the Board to direct all future communications to the Former Association's legal counsel. The University followed this directive and its counsel attempted to address the issues with Defendant's counsel.

38. Over the course of the next week, the University, through its counsel, attempted to communicate multiple times with the Former Association's counsel to no avail . . .

39. In the meantime, the Former Association, in coordination with its Officers, made multiple . . . oral and written statements about the University and its Administration to Alumni, donors and members of the public having relationships with the University. For example, the Former Association published a letter to its website, dated March 21, 2018, addressed to Dr. Daniel R. Jackson, Chair of the Oakwood University Board of Trustees (the "Website Letter"). In the Website Letter, the Former Association through its counsel accuses the University of "unlawful intermeddling and interference with the activities of [the Former Association]" . . .

40. On March 22, 2018, counsel for the University attempted again to reach . . . [an] understanding regarding fund-raising during Alumni Weekend. . . . Through counsel, the Board requested that the Former Association not accept donations while its exempt status [was] revoked, but offered to receive and hold any donations in a separate account and to disburse such funds as requested by OUAA. The Board also offered to issue a joint statement to Alumni and donors in advance of Alumni Weekend. . . .

41. . . . On March 27, 2018 at 9:06 AM, counsel for the University followed up to see if the Former Association intended to respond to the University's requests regarding Alumni Weekend . . . Later that day, counsel for the University informed the Former Association's counsel that they needed to come to a written understanding by close of business March 28, 2017. . . .

42. On March 28, 2018, after . . . having learned of the Former Association's plans to have an unidentified, third-party charity accept donations during Alumni Weekend, the Board, through counsel, gave the group straightforward directives . . .

43. In this message, the Board advised the Former Association not to use the unknown third-party to accept donations raised through the use of the University's name . . . Rather, the Board asked that donations collected be made payable to Oakwood University (whose tax exempt [sic] status is not in question), which would be held for use on behalf of the Alumni Association . . .

44. . . . the Former Association insisted on using the unaffiliated third-party organization to receive and hold the funds until its status could be reinstated. The University could not agree to this arrangement in light of its obligations under the SACS accreditation standards.

45. With thousands of Alumni scheduled to arrive for Alumni Weekend the next day, the Board decided to wait until after the weekend to determine what to do . . .[20]

(Doc. 1, pp. 15-18; see *also*, Doc. 44-1, p. 2, ¶4).

On April 16, 2018, the University decided to break ties with the Alumni Association. (Doc. 1, p. 20, ¶50). The University revoked the Alumni Association's permission to use the University's name and trademarks and to raise funds on the University's behalf. (Doc. 1, p. 20, ¶51). The University, through counsel, sent the Alumni Association a cease and desist letter that, in pertinent part, stated:

Effective immediately, the University disassociates itself from the [Association] and all the [Association]'s fundraising efforts. The [Association] no longer has permission to use the University's name (or Oakwood College's name) in any manner associated with the [Association] or its fundraising efforts. The University hereby requests that the [Association] immediately cease and desist from using the University's name or registered marks in any form or media whatsoever, including its website or other communications. The

---

[20] The University asserts that the Alumni Association made multiple false and defamatory written and oral statements about the University during this time. (Doc. 1, pp. 18-19, ¶¶46–48).

> University also requests that, effective immediately, the [Association]
> stop representing to the public or the University's alumni that the
> [Association] raises funds for the University or that the purpose of the
> [Association] is to raise such funds.

(Doc. 1-10, p. 2; Doc. 1, pp. 20–21, ¶52).  The Association did not respond.

On May 14, 2018, the University sent a second letter that, in pertinent part,

stated:

> 1) The . . . Association and its representatives must accept the Board's
> decision that the group has been disassociated from the University and
> all University fundraising efforts (i.e. the Former Association must
> cease and desist from all fundraising and solicitation efforts on behalf
> of the University and make that clear to the public).

> 2) The . . . Association and its representatives must cease and desist
> from using the University's name, Oakwood College's name, and any
> confusingly similar variants thereof (including the University's initials)
> for any reason or in any form or media, including in the group's name
> or on the group's website and/or letterhead.

> 3) Similarly, the . . . Association and its representatives must
> immediately cease and desist from using, in any form or media
> whatsoever, including on its website or other communications any and
> all trade or service marks of the University, whether registered or
> unregistered, including the marks identified in U.S. Trademark
> Registration Nos. 3,601,698, 3,591,212 and 4,352,439, and any
> pending applications, among other trade and service marks.

> 4) The . . . Association and its representatives must immediately cease
> all such use, and further must withdraw or cancel the name reservation
> filed March 19, 2018 for "Oakwood University Alumni Association"
> that is currently pending in the office of the Alabama Secretary of State.

> 5) The . . . Association and its representatives must immediately cease
> and desist from attempts to plan or organize alumni fundraising events,
> including Oakwood University's Alumni Weekend and inserting
> representatives into Aeolian activities, or other alumni fundraising

events. The University's Office of Advancement and Development, working in harmony with University alumni, is now charged with the execution of those duties.

(Doc. 1-12, p. 3; Doc. 1, pp. 22–23, ¶56).  In this letter, the University gave the Alumni Association until May 17, 2018 to comply with these demands.  (Doc. 1, pp. 22–23, ¶56; Doc. 1-12, p. 2).  The Association refused to respond to, or comply with, this second letter.  (Doc. 1, p. 23, ¶57).

### E. **Post-Lawsuit Use of the University's Marks**

To compel the Association's compliance with its instructions regarding fundraising, on June 2, 2018, the University sued and asked the Court to enjoin the Alumni Association from using the University's marks.  (Doc. 1).  Since then, the Alumni Association has continued to operate the website oakwoodalumni.org. (Doc. 1, p. 26, ¶63). The following header appears on that site:



(*See* http://oakwoodalumni.org/).   As the image indicates, the Alumni Association continues to use the "Oakwood University" and "OU" marks, the University's color

scheme, and the "flame of knowledge" that appears on the University seal Ancillary

Mark. (*See* Doc. 1-2, pp. 2-3; Doc. 1, p. 7, ¶15).  The website also features displays

of the stylized Ancillary Mark "The Aeolians" as in the following image:



([http://oakwoodalumni.org/aeolians-in-orlando/](http://oakwoodalumni.org/aeolians-in-orlando/);  Doc.  1,  p.  26,  ¶63).      Other

University trademarks appear in photos and videos posted on the website. The

Alumni Association still uses the name "Oakwood University Alumni Association"

in correspondence and solicitations.  (Doc. 1, p. 26, ¶63).

At the address [http://oakwoodalumni.org/about-us](http://oakwoodalumni.org/about-us), the following appears:

The Oakwood University Alumni Association is organized to connect
and engage Oakwood alumni, students and friends of the University
and promote the welfare of Oakwood University. We have a desire to
constantly improve the quality and scope of the work we do. We need
your help. Oakwood Alumni and friends are talented and proud of our

legacy, together we can build upon our past and create new opportunities for the future.

Although there is no direct link to this page from the website's home page, the page is published and viewable if a person enters the above website address.

As shown in the following image, in November 2018, the Alumni Association used Oakwood's colors, the flame of knowledge, and the Oakwood University and OU marks for its "Giving Tuesday" campaign:



(http://oakwoodalumni.org/giving-tuesday/).  Again, although there is no direct link

to this page from the website's home page, the page is published and viewable at the

above website address.  As seen in the image, the Alumni Association notes it

contributes money to "University capital campaign projects."  As shown on the

following image, that campaign directly competed with the University's annual Giving Tuesday campaign:



([https://twitter.com/OakwoodU/status/1067433010159484930/photo/1](https://twitter.com/OakwoodU/status/1067433010159484930/photo/1)).

## II.     PROCEDURAL BACKGROUND

In an early effort to mend the parties' relationship and find common ground, the undersigned referred this action to a magistrate judge for mediation.  (Doc. 28). After more than four months in mediation with the magistrate judge (9-5-18 docket

entry through 1-22-19 docket entry), the parties reached an impasse.  (Doc. 38).

After receiving briefing and evidence from the parties concerning the University's

motion for preliminary injunction, the Court found that the record established the

University no longer would accept donations from Alumni Association.  (Doc. 46,

p. 1) (citing Doc. 44, p. 3).   The Court noted it had reviewed the Alumni

Association's website and other Association publications and found that "some of

the language on the website and in other publications may confuse potential donors"

because donors might infer that the Alumni Association would continue to donate

directly to the University. (Doc. 46, p. 1).[21]   The Court instructed the parties to

develop an appropriate disclaimer for the Alumni Association to use in its

publications "to eliminate potential confusion regarding fundraising."  (Doc. 46, p.

2).

In anticipation of Alumni Weekend in the spring of 2019, on March 28, 2019,

the Court ordered as follows:

> In light of the parties' upcoming annual alumni events, to eliminate
> potential confusion regarding fundraising, the Court orders the parties
> to comply with the following instructions:
>
> 1.      All written communications published by or on behalf of
> Oakwood University Alumni Association after the date of this Order

---

[21] In that order, the Court cited the March 19, 2019 version of a page of the Alumni Association's
website entitled "WHERE DOES THE MONEY GO?" and noted the Alumni Association stated
money the Association raised went to "OUR UNIVERSITY."  (Doc. 46, p. 2).  Currently, that
page does not contain that language.

that relate to fundraising or other aspects of its operations will prominently feature the following notice:

> **Notice:**   This Association is independent from and not affiliated with Oakwood University.   This Association may not and does not raise funds for or on behalf of Oakwood University.   This Association raises funds for alumni activities that the Association sponsors.   The Association also raises funds to donate directly to students who now attend, will attend, or have attended Oakwood University to provide assistance with educational expenses.

2.     The Association will not in any communications state, suggest, or imply that it provides funds to Oakwood University or that the Association represents Oakwood University.  The Association may communicate that it donates funds directly to students who now attend, will attend, or have attended Oakwood University to provide assistance with educational expenses.

3.     As soon as possible but no later than seven days from the date of this order, the Association will remove from its website and social media accounts (including, but not limited to, Facebook, Twitter, YouTube, and Instagram) statements that suggest or imply that it provides funds to Oakwood University or that the Association represents Oakwood University.   This instruction does not affect statements concerning donations of funds directly to students who now attend, will attend, or have attended Oakwood University to provide assistance with educational expenses.

4.     Until this litigation is resolved, neither party may issue public statements (e.g., press releases) regarding this litigation.

(Doc. 47, pp. 1-2, ¶¶1-4).

During the 2019 Alumni Weekend, Dr. Powell-Hicks and other representatives of the Alumni Association distributed copies of the following printed communication:



(Doc. 48, pp. 2-3).  The University brought the publication to the Court's attention

and argued the flyer violated the Court's March 28, 2019 Order.  The Court agreed.

(Doc. 51).  The Court wrote:

A written communication concerning fundraising that merely refers readers to the Alumni Association's website does not satisfy the notice requirement. If the Alumni Association is not sure whether a written communication should contain the notice language, then the Association should request guidance before it publishes the written communication. Future violations of the Court's instructions shall be grounds for sanctions.

(Doc. 51).

At some point, the Alumni Association published and circulated the following written communication:



(Doc. 55, p. 5).  The communication does not contain the notice required by the March 28, 2019 Order.  Then, the Alumni Association revised this communication as follows:



(Doc. 61-2, p. 8). The tiny language at the bottom of the card is the court-ordered disclosure.

The Court found that neither communication complied with the March 28, 2019 order which requires the notice language to appear prominently on Alumni Association communications concerning fundraising. (Doc. 60, p. 1). The Court found the notice language in the revised communication was "barely visible and illegible because of the tiny font style." (Doc. 60, p. 4, ¶7). The Court ordered:

a. Future written communications from the Association that relate to fundraising or other aspects of its operations shall include the Notice Language in a font size, boldness, and color consistent with the font used in the primary portion of the written communication. The Notice Language must be easily legible.

b. To meet the requirements of the Court's March 28, 2019 Order, the notice language must be prominently featured, which means, among

other things, that it must be placed in a written communication (including video) where it will be seen by everyone reading or viewing the communication.

c. Future violations of the Court's Order shall result in sanctions against the Association, the Association's officers, or both. The Court reiterates: "If the Alumni Association is not sure whether a written communication should contain the notice language, then the Association should request guidance before it publishes the written communication." (Doc. 51). Similarly, if the Association is not sure whether a written notice meets the requirements set forth above such that the notice is "prominently feauture[d]," then the Association should request guidance before it publishes the written communication.

(Doc. 60, pp. 4-5, ¶¶a-c).

In April 2020, the Alumni Association published on its Facebook page a series of videos entitled "7 Days of Praise."  One of the videos begins with a narrator saying:

For more than 9 decades, the Oakwood University and Oakwood University Alumni Association (OUAA) has [sic] worked together soliciting funds for students' education and goodwill towards Oakwood and its experience. OUAA has remained steadfast to this decades old mission.

(*See*  https://www.facebook.com/375235169965/videos/655544405289942/).   The following still frame is from a portion of the video during the narration:



(*See* https://www.facebook.com/375235169965/videos/655544405289942/).   The

video is approximately 44 minutes long.  The notice in the above still frame appears

12 seconds into the video and disappears after five seconds.  The notice reappears

with approximately two minutes left in the video during a fundraising pitch

involving the following still frame:



(https://www.facebook.com/375235169965/videos/655544405289942/).  The video for another day omits the notice until the fundraising pitch from the previous video appears.

(https://www.facebook.com/375235169965/videos/1152552171746654/?v=1152552171746654).

## III.    CONCLUSIONS OF LAW

To be entitled to an order preliminarily preventing the Alumni Association from using the trademarked name "Oakwood University," the University must establish a substantial likelihood of success on the merits of its trademark infringement claim and a substantial threat of irreparable injury in the absence of an injunction that outweighs the potential harm to the Alumni Association.   The

University also must demonstrate that an injunction "will not disserve the public interest." *Friedenberg v. Sch. Bd. of Palm Beach Cty.*, 911 F.3d 1084, 1090 (11th Cir. 2018). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion for each prong of the analysis." *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (internal quotations and citations omitted).

Before delving into the details of the University's infringement claim to decide whether the University has demonstrated a likelihood of success on the merits of that claim, we should review a few basics of trademark law. A trademark is "any word, name, symbol, or device, or any combination thereof" used by a person "to identify and distinguish his or her goods ... from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. Under the Lanham Act, "marks that are capable of distinguishing the owner's goods from those of others, *i.e.*, that are sufficiently 'distinctive,' are eligible for federal registration . . ." with the United States Patent & Trademark Office. *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010). As the Court has found, the University successfully registered the mark "Oakwood University" in 2009.

The owner of a federally registered trademark may protect its mark under Section 32(a) of the Lanham Act. The Act provides:

**(1)** Any person who shall, without the consent of the registrant--

**(a)** use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

**(b)** reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

15 U.S.C.A. § 1114(1)(a); *see also*, *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order*, 809 F.3d 1171, 1181 (11th Cir. 2015) ("A person is liable for infringement if he uses a mark in commerce that is confusingly similar to a registered mark.") (citing 15 U.S.C. § 1114(1)(a)).

"Under the Lanham Act, 15 U.S.C. § 1114(1), a defendant is liable for trademark infringement if the plaintiff shows (1) that its mark has priority and (2) that the defendant's mark is likely to cause consumer confusion." *PlayNation Play Systems, Inc. v. Velex Corporation*, 924 F.3d 1159, 1165 (11th Cir. 2019) (citing *Frehling Enter., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999)).

The parties agree the University has priority in the mark "Oakwood University."[22] Therefore, the University is likely to prevail on its infringement claim if the University can demonstrate that the Alumni Association adopted a name "that was the same, or confusingly similar to" the University's mark, "such that consumers were likely to confuse the two." *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010).[23]

### A. Substantially Likelihood of Success on the Merits of a Trademark Infringement Claim

The University contends that the Association's use of the trademarked name "Oakwood University" for developing relationships with Oakwood University alumni is confusing because alumni who join the "Oakwood University Alumni Association" and/or donate to the Association may believe the University and the Alumni Association are affiliated and the Alumni Association is a conduit for donations to the University, but the two entities no longer are associated, and the University may not accept donations from the Association.

---

[22] During the July 17, 2020 video conference in this matter (*see* July 17, 2020 minute entry), the parties acknowledged that the University has priority in the Oakwood University mark.   A transcript of the hearing is available upon request.

[23] *Tana* concerns a trademark infringement claim under § 43(a) of the Lanham Act.  Because the confusion prongs of the infringement tests under § 32(a) and § 43(a) of the Lanham Act are substantially similar, a district court may rely on cases decided under § 43(a) when evaluating consumer confusion.  611 F. 3d at 773 n.5.

When evaluating a mark's propensity to confuse consumers, a district court considers seven factors:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Webster v. Dean Guitars*, 955 F.3d 1270, 1278 (11th Cir. 2020) (quoting *Tana*, 611 F.3d at 774-75); *see also, Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order*, 809 F.3d 1171, 1181 (11th Cir. 2015).  "'The appropriate weight to be given to each of these factors varies with the circumstances of the case.'"  *Webster v. Dean Guitars*, 955 F.3d 1270, 1278 (11th Cir. 2020) (quoting *AmBrit, Inc. v. Kraft, Inc*., 812 F.2d 1531, 1538 (11th Cir. 1986)).  "The district court 'does not have to consider all of these factors in every case and in some cases, "new" factors may merit consideration.'" *Sovereign Military Hospitaller*, 809 F.3d at 1181 (quoting *Swatch Watch, S.A. v. Taxor, Inc.*, 785 F.2d 956, 958 (11th Cir.1986)).  "'The real question is whether the court's ultimate determination about the 'likelihood of confusion' was correct.'"  *Sovereign Military Hospitaller*, 809 F.3d at 1181 (quoting *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1543 (11th Cir.1985)).

"The unauthorized use of a mark by a former licensee presents a particular danger of confusion to the public. It has been described as 'a fraud on the public, since they are led to think that the ex-licensee is still connected with the licensor.'" *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 309 (E.D. Pa. 2000) (quoting 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:31 (5th ed.)); *see also, Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983) ("Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks.").

### 1.   The Strength of the Mark Alleged to Have Been Infringed

Oakwood University is the primary mark belonging to the University that the Association allegedly has infringed.   The strength of a mark is measured by its distinctiveness and by "the extent of third-party use of the mark." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983) (internal marks and citations omitted); *see also Frehling Enterprises,* 192 F.3d at 1335-36.[24]

"Distinctive marks are marks that 'serve the purpose of identifying the source of the goods or services.'"   *Tropic Ocean Airways, Inc. v. Floyd*, 598 Fed. Appx.

---

[24] In evaluating the strength of a mark, a court also may consider whether the mark has become incontestable pursuant to 15 U.S.C. § 1065(3).   *Frehling Enterprises*, 192 F.3d at 1336.   There is no evidence in this case that the University has taken the steps necessary to make the mark "Oakwood University" incontestable.

608, 610 (11th Cir. 2014) (quoting *Welding Servs., Inc. v. Forman*, 509 F.3d 1351,

1357 (11th Cir. 2007)).   There are four levels of distinctiveness, ranging from

generic marks, which are the least distinctive, to fanciful and arbitrary marks, the

most distinctive marks.   As the Eleventh Circuit has explained:

> a mark can be "distinctive" in one of two ways: It can be "inherently"
> distinctive, or it can "acquire" distinctiveness over time. Inherently
> distinctive marks themselves identify the source of a particular product
> or service: "Coca-Cola," for example, describes only one brand of soft
> drink—one producer. A mark that has acquired distinctiveness, by
> contrast, might initially have been understood to describe a broad class
> of potential products or services, but over time it has taken on a
> "secondary meaning" that links it to a particular source: "California
> Pizza Kitchen," for example, may facially describe any random pizza
> eatery in the Golden State, but the public has come to associate it with
> one brand in particular.
>
> To separate the "distinct" from the non-"distinct"—and to differentiate
> among the distinct, for that matter—we have classified marks into four
> categories, in descending order of strength: (1) "fanciful" or "arbitrary,"
> (2) "suggestive," (3) "descriptive," and (4) "generic." We consider
> fanciful marks (think "Verizon" telecommunications—the name is a
> made-up word), arbitrary marks (think "Apple" computers—the name
> is a real word that has nothing to do with the product) and suggestive
> marks (think "Igloo" coolers—the name is a real word that bears only
> an oblique relationship to the product) to be "inherently" distinctive.
> For marks in these categories, no proof of secondary meaning is
> necessary.  By contrast, we consider descriptive marks (for example, an
> eyeglasses store called "Vision Center") and generic marks (a book-
> selling company called "Books") not to be inherently distinctive.
> Descriptive marks can become protectible only if they "acquire"
> distinctiveness by obtaining a "secondary meaning," and generic marks
> can never become protectible.

*Royal Palm Properties, LLC v. Pink Palm Properties, LLC*, 950 F.3d 776, 782–83

(11th Cir. 2020) (footnote and citations omitted).

When a mark is registered with the USPTO, there is a "rebuttable presumption that the mark[ ] [is] protectable or 'distinctive.'" *Royal Palm Properties*, 950 F.3d at 783 (internal quotations and citations omitted); *see also*, *Welding Servs.*, 509 F.3d at 1357 n.3 ("Registration establishes a rebuttable presumption that the marks are protectable or 'distinctive.'").   Because the University registered the mark "Oakwood University" with the USPTO, the Court presumes the mark is distinctive. *Royal Palm Properties*, 950 F.3d at 784.

To "successfully challenge a registered mark on distinctiveness grounds, the challenger must overcome the presumption of validity by showing—by a preponderance of the evidence—that the mark is not distinctive." *Royal Palm Properties*, 950 F.3d at 783 (citations omitted).  The Alumni Association has not tried to prove that the mark "Oakwood University" is not distinctive.  Had the Alumni Association tried, the challenge would fail because "Oakwood University" is inherently distinctive.  Like "Apple" computers, "Oakwood" is an arbitrary mark because "Oakwood" is a word that has nothing to do with the University's product but instead is a word selected to describe the property on which the school was founded. *See* page 1.  "Arbitrary marks are the strongest of the four categories" of marks. *Frehling Enterprises*, 192 F.3d at 1336.

As for third-party use of the mark, "[t]he less that third parties use the mark, the stronger it is, and the more protection it deserves." *Frehling Enterprises,* 192

F.3d at 1336.   The only evidence of third-party use of the mark "Oakwood University" is the Association's name, Oakwood University Alumni Association. While that use dilutes the strength of the University's mark somewhat, the mark, overall, is very strong, especially given the Court's finding that the University allowed the Alumni Association to use the Oakwood University mark.

### 2. The Similarity of the Infringed and Infringing Marks

Assuming for purposes of this opinion that the Alumni Association has its own legitimate mark, its mark, "Oakwood University Alumni Association," is very similar to the University's registered mark, Oakwood University.[25]   As noted in the factual findings, the Alumni Association uses the University's ancillary mark, a flame (*see* pages 27, 31, 32, 33, 35, above), in conjunction with its mark, "OUAA Oakwood University Alumni Association (*see* pages 27, 31, 32, 33, 35, above).

---

[25] The Alumni Association contends that it owns a mark that is independent of the University's registered mark. The Association posits:

> OUAA owns the trademark "OAKWOOD UNIVERSITY ALUMNI ASSOCIATION." Plaintiff owns a different composite mark, "OAKWOOD UNIVERSITY." They have co-existed in their current forms since 2010 and in their earlier forms since 1926, and each is an established independent mark with a separate owner.

(Doc. 18, p. 10).  The University contends that it licensed the Association's use of "Oakwood University," and it revoked that license in April 2018.  The Court assumes for purposes of this discussion that the Association has rights in an independent, common law mark "Oakwood University Alumni Association."

3. <u>The Similarity Between the Goods and Services Offered Under the Two Marks</u>

Practically, there are few differences between the alumni activities of the University and the Alumni Association.  The University and the Association organize alumni events.  Both raise funds for student scholarships and other forms of student assistance.  For years, and even after the University severed its ties with the Alumni Association, the Association represented publicly that it raised funds which it donated to the University.  (pages 27, 29, 31).  The goods and services the University offers are significantly broader than the goods and services the Association provides, but where there is overlap, it is considerable.

The Association argues the goods and services it offers under its alleged common law mark are different from the goods and services the University offers under its registered mark.  The Association points to the fact that the University registered its mark in connection with, among other things, "educational" and "entertainment services."  (Doc. 1, pp. 6-7, ¶10; Doc. 1-1, pp. 2-3; Doc. 15, pp. 2-3, 21-22, ¶¶10, 16; Doc. 20, p. 4, ¶16).  The Association argues that because the registration did not specifically include "charitable services" or "fundraising activities," the University did not protect its mark for those purposes.  (Doc. 18, pp. 2-3, 7-8).

The Alumni Association's argument is not persuasive for at least two reasons. First, the similarity of goods and services factor is a measure of consumer confusion. Consumers are not concerned with technicalities like the scope of a registered mark. Consumers evaluate available goods and services, and the goods and services that the University and the Association offer to Oakwood alumni are very similar. Second, "the educational activities of a non-profit educational institution inherently encompass charitable services. Thus, [a] registration certificate logically extends to the University's use of [its] marks in fundraising activities that are necessary to support its education and entertainment activities." *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 302 (E.D. Pa. 2000); *see also, Potomac Conference Corp. of Seventh-Day Adventists v. Takoma Acad. Alumni Ass'n, Inc.*, No. CIV.A. DKC 13-1128, 2014 WL 857947, at *8 (D. Md. Mar. 4, 2014) (alumni activities are a necessary activity undertaken by a school in support of its educational services and mission). As the Eleventh Circuit has explained:

> We recognize that, as to federally-registered trademarks, we have not limited protection to the actual product or products listed in the certificate of registration. "The remedies of the owner of a registered trademark," we have held, "are not limited to the goods specified in the certificate, but extend to any goods on which the use of an infringing mark is 'likely to cause confusion.'"

*Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1266–67 (11th Cir. 2017) (quoting *Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857, 861 (5th Cir. 1967) (citation omitted)).

### 4. The Similarity of Advertising Methods and Actual Sales Methods Used by the Holders of the Marks, Such as Their Sales Outlets and Customer Base

The record does not contain details about the methods the University and the Association use to contact, support, and organize alumni and to raise funds from alumni, but the record discloses generally that both the University and the Alumni Association use social media and other forms of communication to maintain contact with Oakwood alumni.  As noted, both sponsor alumni events.  Until their relationship soured, the University and the Alumni Association coordinated events for Alumni Weekend each spring.  Most importantly, the customer base of the Association and the University with respect to alumni relations is identical.[26]

### 5. The Intent of the Alleged Infringer to Misappropriate the Proprietor's Good Will

Where the evidence demonstrates the alleged infringer intended to "capitalize on the popularity of" the plaintiff's product and hoped to "catch the attention" of the plaintiff's consumers with the infringing mark, the intent factor weighs in favor of a finding of consumer confusion.  *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1545 (11th Cir. 1985); *see also Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (11th Cir. 1980) ("if the mark was adopted with the intent of deriving benefit

---

[26] On the record in this case, it is logical to blend the discussion of the fourth of fifth factors in the customer confusion analysis.

from the reputation of "Domino" that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'") (quoting RESTATEMENT OF TORTS, §729, comment f (1938)).   "Bad faith in the adoption and use of a trademark normally involves the imitation of packaging material, use of identical code numbers, adopting of similar distribution methods or other efforts by a party to "pass off" its product as that of another." *Amstar Corp.*, 615 F.2d at 263 (citing *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 382-83 (5th Cir. 1977)).

Here, bad faith consists not only of the Alumni Association's use of the University's registered mark, its ancillary marks, and it colors but also the Alumni Association's repeated violation of court orders designed to distance the Association's product from the University's product while the Court attempted to help the parties resolve their dispute.   As the Court has found, after the University severed its ties with the Association, the Association continued to use the "Oakwood University" and "OU" marks, the University's blue and gold color scheme, and the "flame of knowledge" that appears on the University seal ancillary mark. (*See* Doc. 1-2, pp. 2-3; Doc. 1, p. 7, ¶15).   "[T]o eliminate potential confusion regarding fundraising" and enable the Alumni Association to continue its operations with minimal disruption while the Court addressed the parties' disagreement, the Court

ordered the Alumni Association to include "prominently" in its communications to alumni the following clarifying language:

> **Notice:**   This Association is independent from and not affiliated with Oakwood University.   This Association may not and does not raise funds for or on behalf of Oakwood University.   This Association raises funds for alumni activities that the Association sponsors.   The Association also raises funds to donate directly to students who now attend, will attend, or have attended Oakwood University to provide assistance with educational expenses.

(Doc. 47).   The Alumni Association repeatedly violated the Court's order by ignoring the notice requirement or providing the notice in a format virtually undetectable and certain to go unseen by alumni.  The Alumni Association's conduct leaves no room for doubt about its intent; the Association wants Oakwood alumni to direct their giving to the Alumni Association instead of the University.

### 6.   The Existence and Extent of Actual Confusion in the Consuming Public

"The most persuasive evidence in assessing the likelihood of confusion is proof of actual confusion.  *All. Metals, Inc., of Atlanta v. Hinely Indus., Inc*., 222 F.3d 895, 907 (11th Cir. 2000) (citing *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1514 (11th Cir. 1984)); *see also*, *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971) ("[I]t is not necessary to show actual confusion. One merely has to show that the likelihood of confusion exists. There can

be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion.").[27]  "Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof."  *World Carpets*, 438 F.2d at 489.  The record before the Court indicates that, since the split, there has been actual confusion regarding the relationship between the University and the Alumni Association.  In October 2018, a University alumna contacted the University's Office of Advancement and Development seeking a receipt for a donation she made to the Alumni Association.  (Doc. 40-5, pp. 1-2, ¶8).[28]

Emile Parker, the University's Director for Alumni Relations in the Office of Advancement and Development since August 2018, states he has witnessed confusion caused by the Alumni Association's use of the Oakwood University name since he began his position.  (Doc. 40-5, p. 1, ¶5).  He explains:

> Over the past several months, I spoke with numerous people who were confused about how to make donations to the University. These people wanted to give money to the University, but were not sure if they should donate directly to the University or if a donation to the Association was

---

[27] This Court is bound by decisions the former Fifth Circuit rendered before October 1, 1981, *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[28] The Association objects to this and other evidence of actual confusion as hearsay.  (Doc. 41, p. 12).   The objection is without merit as the Court may consider hearsay at this stage of the proceedings.  *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'") (quoting *Asseo v. Pan American Grain Company*, 805 F.2d 23, 26 (1st Cir. 1986)).

a donation to the University. I heard these questions from alumni and University supporters located throughout the United States. I tried to give clarity to these individuals that donations to the Association are not donations to the University as it is no longer associated with the school.

(Doc. 40-5, p. 1, ¶6).  Mr. Parker also notes:

In planning for the University's 2019 Alumni Weekend, I observed significant confusion regarding the relationship between the University and the Association. When my office first published the flier for the Alumni Weekend, I saw significant questions and concerns about the event, both in private conversations and on social media. Specifically, people were confused whether the University or the Association was sponsoring Alumni Weekend events.

[] Additionally, local businesses expressed confusion over the relationship between the University and the Association. In my office's effort to secure hotel rates for Alumni Weekend, at least one hotel was confused about my inquiry as they thought they already set rates for the Alumni Weekend. In a January 22, 2019 conversation with the hotel, I explained that they established rates with the Association which is separate from the University. The hotel spoke with me about setting a University rate, but had concerns that having two rates for similar University and Association names would confuse their staff handling reservations. For a November 2018 event, I needed to reserve items from a local rental company. When I called and dropped by the vendor, they were unsure whether they should list my bill under the University's account or the Association's account. I had to explain the difference between the two entities since the names were similar.

(Doc. 40-5, p. 2, ¶¶9-10).  Oakwood alumni have called Mr. Parker's office by

mistake when trying to reach the Alumni Association.  (Doc. 61-1, p. 3, ¶10).

Twitter exchanges illustrate the confusion over which entity, the University

or the Association, was holding an alumna gathering at the Von Braun Civic Center

in Huntsville.  (Doc. 40-4, pp. 20-21 (alum describing herself as "mad confused"

about 2019 Alumni Weekend events); *see also*, Doc. 40-4, p. 36 ("So who will have their service at the Von Braun/ The new Alumni Relations team or OUAA?  This is so confusing!"); Doc. 40-4, p. 33 (noting confusion between whether the group known as "Dynamic Praise" was part of the University and commenting "[p]erhaps an attorney can better clarify"); Doc. 40-4, p. 10 ("Which one are we . . . ou [sic] or OUAA?")).

On January 24, 2019, comedian Anthony Hackett posted to YouTube and Facebook a video parodying the confusion.  The following still is from that video as it appears on YouTube:



(https://www.youtube.com/watch?v=Dt4IszXjjGY).   In the Facebook comments, Mr. Hackett noted he "just put to video what Oakwood alumni have been saying all over facebook [sic] already."  (Doc. 40-4, p. 25).  Other comments in response to the video generally agreed with the video's characterization of the confusion.  (Doc. 40-4, p. 1, ¶8; *see* Doc. 40-4, pp. 25-30).

As the 2019 Alumni Weekend approached, the University's Office of Integrated Marketing and Public Relations fielded questions from several people confused about the relationship between the University and the Alumni Association and alumni giving.  (Doc. 40-4, pp. 1-3, ¶¶9-10).  Kenn Dixon, Director of the University's Office of Integrated Marketing and Public Relations, states he fielded some of those questions and heard from people who did not know whether money sent to the Association would make it to the University.  (Doc. 40-4, p. 2, ¶9).  *See Villanova Univ.*, 123 F. Supp. 2d at 300 (evidence of confusion over what entity was sponsoring an event); *Takoma Acad.*, 2014 WL 857947, at *13 (evidence of inquiries as to which organization was associated with the school and requests for tax receipts from the school for donations paid to the alumni association).

Thus, the record contains overwhelming evidence of consumer confusion. Because the parties agree the University's "Oakwood University" mark has priority over the Association's claimed mark, the University has established a substantial likelihood of success as to its trademark infringement claim.

### 7. OU vs. OUAA

The Alumni Association contends that even if the University can establish a likelihood of success on its infringement claim as it pertains to the "Oakwood University" mark, the Association has a separate mark, OUAA, that does not infringe on the University's unregistered mark, OU. The Association argues it should be allowed to continue to use OUAA.

If OU and OUAA are marks distinct from Oakwood University and Oakwood University Alumni Association, respectively, then -- with one exception -- the analysis concerning the Oakwood University and Oakwood University Alumni Association marks applies equally to the OU and OUAA marks. If it is a separate mark, the OU mark is not as strong as the Oakwood University mark because the University did not register OU, and OU is not as distinctive as Oakwood University. Otherwise, it is undisputed that OU has priority over OUAA, and the analysis of the other factors regarding confusion is identical to the discussion of the factors as they pertain to the marks Oakwood University and Oakwood University Alumni Association.

Some would say that OU and OUAA are not separate marks that require separate analysis. Some would say these are merely abbreviations for Oakwood University and Oakwood University Alumni Association, respectively, that travel in tandem with their related marks. Some courts have held that "[i]nitials for a

descriptive phrase merely represent short forms of the words for which they stand and should receive the same degree of protection as those words." *Superior Performers, Inc. v. Family First Life, LLC*, No. 1:14CV283, 2015 WL 4158757, at *4 (M.D.N.C. July 9, 2015) (internal quotations and citations omitted); *see also G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 994 (7th Cir. 1989) ("[T]here is a heavy burden on a trademark claimant seeking to show an independent meaning of initials apart from the descriptive words which are their source."); *U.S. Conference of Catholic Bishops v. Media Research Ctr.*, 432 F. Supp. 2d 616, 623 (E.D. Va. 2006). We do not decide today whether to adopt this reasoning because on the record here, the result is the same either way; the University has established a substantial likelihood of success on its trademark infringement claim both with respect to "Oakwood University" and "OU."

B. ***Substantial Threat of Irreparable Injury in the Absence of an Injunction***

1. The University Has Established It Will Suffer Irreparable Injury Unless the Injunction Issues

In the Eleventh Circuit, there is "a presumption of irreparable harm once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227 (11th Cir. 2008); *see also*, *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1029 (11th Cir. 1989). But in its latest pronouncement on the issue, the Eleventh Circuit noted the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

388 (2006), casts doubt on the validity of the presumption. *N. Am. Med. Corp.*, 522 F.3d at 1228.

With or without the presumption, because there is substantial evidence of actual confusion, there is harm, and that harm is irreparable.  The Court tried to help the Alumni Association mitigate the harm by requiring a disclaimer designed to curtail confusion, but the Association repeatedly refused to use the disclaimer properly.  The record demonstrates the University's inability to control its mark could impact its accreditation.  (*See* Doc. 44-1, p. 3, ¶7) ("By continuing to hold itself out as raising funds for the University, even though the requirements of SACSCOC 5.3 are not being satisfied, OUAA endangers the University's accreditation.").  It has been said that a company's mark "is [its] authentic seal; by it [the company] vouches for the goods which bear it; it carries [the company's] name for good or ill.  If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use." *Ambassador E., Inc. v. Orsatti, Inc.,* 257 F.2d 79, 82 (3d Cir. 1958) (internal quotations and citations omitted).  How much more the injury when the borrower does tarnish the name by, for example, failing to file forms required by the IRS for three years.  (Doc. 1, p. 14, ¶32).  Money damages cannot repair the potential damage to University's reputation.

Therefore, the University has established it will suffer irreparable injury if the Court withholds an injunction.

2. <u>The Balance of the Equities Favors an Injunction.</u>

As noted above, the Alumni Association's continued use of the University's marks adversely effects the University's goodwill and reputation.  On the other hand, the Association may organize activities for Oakwood alumni and raise funds for Oakwood students without using the Oakwood marks.  *Potomac Conference Corp. of Seventh-Day Adventists v. Takoma Acad. Alumni Ass'n, Inc*., No. CIV.A. DKC 13-1128, 2014 WL 857947, at *21 (D. Md. Mar. 4, 2014)   ("[A] preliminary injunction barring use of the marks at issue still allows Defendant to fundraise and host events for students and alumni."); ."  *Villanova Univ.*, 123 F. Supp. 2d at  311 ("'One who uses another's marks without permission 'can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself.'") (quoting *Opticians Association of America v. Independent Opticians of America*, 920 F.2d 187,197 (3d Cir. 1990) (citations omitted)).  True, the Association will have to adopt a new name and introduce that name to Oakwood alumni, but the evidence shows Oakwood alumni are very familiar with – and concerned about – the rift between the University and the Alumni Association, so alumni will not be surprised by a new name.  And, again, the Alumni Association

brought the inconvenience on itself; the whole matter could have been resolved with a bit of cooperation from the Association.

The Alumni Association relies on *Computer Currents Publishing Corp. v. Jaye Communications, Inc.* 968 F. Supp. 684 (N.D. Ga. 1997), to support its argument that an injunction should not issue because the harm to the Association outweighs the harm to the University. (Doc. 41 p. 20). But the facts of *Creative Currents* are distinguishable. In *Creative Currents*, the defendant agreed to stop using the protected mark once it transitioned its business. In our case, the Alumni Association expressly states that "it is not prepared to concede infringement or to give up use of the mark." (Doc. 41, p. 20). The Association argues that, like the defendant in *Creative Currents*, it should be given additional time to "address the merits of the dispute, and possibly reach a solution." (Doc. 41, p. 21). The Association's conduct belies the argument. The Alumni Association has demonstrated repeatedly that it is unwilling to compromise. Nothing short of a preliminary injunction will suffice.

### C. The Injunction Will Not Disserve the Public Interest

The Eleventh Circuit has stated that "in 'ordinary trademark infringement actions ... complete injunctions against the infringing party are the order of the day.'" *Angel Flight of Georgia, Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008) (quoting *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d

1325, 1336 (11th Cir. 1996)).  "The reason is simple: the public deserves not to be led astray by the use of inevitably confusing marks—even in cases in which more than one entity has a legal right to use the mark."  *Angel Flight*, 522 F.3d at 1209 (citing *SunAmerica Corp.*, 77 F.3d at 1336-37).  The issuance of the injunction under the circumstances of this case does not disserve the public interest.

## IV.     CONCLUSION

For the reasons stated above, by separate order, the Court will issue a preliminary injunction that prevents the Alumni Association from using the Oakwood University mark.

**DONE** and **ORDERED** this August 14, 2020.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE